UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DEREK COOPER GUNBY,<br><br>                  Defendant. | Criminal No. 21-cr-626<br><br>**DEFENDANT GUNBY'S MOTION TO CHANGE VENUE TO DISTRICT OF SOUTH CAROLINA, GREENVILLE DIVISION** |

COMES NOW Defendant Derek Cooper Gunby ("Gunby"), by and through undersigned counsel John Pierce, with this Motion to change venue for this trial to the U.S. District of South Carolina, where Gunby was arrested and where evidence was searched and seized. A jury pool and venire drawn from the District of South Carolina will be more fair and less biased than a jury pool and venire drawn from the District of Columbia.

(Gunby has already requested and consented to trial by bench, the Honorable Judge Friedman, in the District of Columbia.) In the event this motion to change venue is granted, however, defendant Gunby seeks a trial by jury in South Carolina presided over by either Judge Friedman or a suitable District Judge from the District of South Carolina.

In the event this motion is granted and venue is transferred to South Carolina, Gunby requests a jury of his peers drawn from a cross section of the community in South Carolina.

MEMORANDUM OF POINTS AND AUTHORITES

Defendant Mr. Gunby, by and through counsel, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure as well as the Sixth Amendment right to a fair trial and the Fifth Amendment right to due process, requests a change of venue due to significant prejudice in the District of Columbia prohibitive of a fair and impartial trial, invoking his right to a fair trial by an impartial jury under the Fifth and Sixth Amendments. Mr. Gunby asserts that detrimental pretrial publicity and community prejudice in Washington D.C. is so likely to have affected the jury pool that the venire must be presumed as tainted. Mr. Gunby proposes that this matter be moved to the U.S. District of South Carolina, Greenville Division, where he resides, and where witnesses for the Defense reside.

I. FACTS

1. Mr. Gunby was arrested in the District of South Carolina after an arrest warrant was issued in Washington, D.C., for his alleged conduct at the Capitol on January 6, 2021.

2. The evidence in this case is centered around the January 6 Capitol incident, the 2020 Presidential election, discussions of politics, and Mr. Gunby's support for the president, Donald Trump. The majority of the Government's

evidence against Mr. Gunby is his discussion of politics. This case is factually and legally political.

3. The District of Columbia is our nation's capitol. It is legally, constitutionally, and culturally distinct from every other city or state. Because of D.C.'s status as the seat of the United States government, its residents are overwhelmingly loyal to, employed by, and benefit from the United States government. D.C. residents <u>are a branch and a component of the plaintiff</u> and prosecution in this case.

4. The D.C. jury pool are the peers of the prosecutor rather than the defendant.

5. The United States has presented and depicted the demonstrations of Jan. 6 as an "attack" on the Capitol. And D.C. residents, overwhelmingly, view the events as an "attack" on themselves, as shown below.

6. The District Court for the District of Columbia draws its jury pool solely from the residents of the District of Columbia. In the 2020 Presidential Election, 94.6% of District of Columbia voters voted against Donald Trump.

7. In the 2016 Presidential Election, 95.9% of District of Columbia voters voted against Donald Trump.

8. About 33% of employed Washington D.C. residents work for the government.

9. Surveys and studies show the United States of America has become increasingly politically divided and polarized in recent years.

10. Democrats specifically have been exposed to heightened levels of media attention focusing on the Capitol incident at issue in this case.

11. President Biden and other prominent Washington D.C. Democratic politicians have decried protestors present during the Capitol incident as "white-supremacists," "domestic terrorists," and dubbed the event an "insurrection."

12. Lawmakers and the media have given the Capitol Incident overwhelming coverage casting negative light on all those involved including Mr. Gunby.

II. LEGAL STANDARD

The Fifth Amendment and the Sixth Amendment entitle criminal defendants to a fair trial by an impartial jury. "The great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 F. Cas. 49, 51 (CC Va. 1807). An impartial jury is required under the Constitution and has been required since the times of common law. Id; see also *Patton v. Yount*, 467 U.S. 1025 (1984). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Federal Rule of Criminal Procedure

21(a) instructs that district courts "must transfer the proceeding . . . if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

While the Sixth Amendment provides a right to trial by "jury of the State and district wherein the crime shall have been committed," the Constitution's place-of-trial prescriptions do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial. *Skilling v. United States*, 561 U.S. 358 (2010); see also *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.")

The Supreme Court has overturned convictions where the district court failed to transfer for venue after prejudicial pretrial publicity. See, e.g., *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. State of Texas*, 381 U.S. 532 (1965); *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The Supreme Court has also reversed convictions where there was a "huge . . . wave of public passion" and where the venire possessed "a belief in [defendant's] guilt." *Irvin v. Dowd*, 366 U. S. 717, 728 (1961) (vacating a conviction and death sentence for the trial court's failure to transfer venue for community publicity); see also *Patton v. Yount*, 467 U.S. 1025 (1984).

Later, in *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976), and then again in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court clarified that "pretrial publicity—even pervasive, adverse publicity— does not inevitably lead to an unfair trial." See Neb. Press Ass'n v. Stuart, 427 U.S. at 554. Instead, a combination of factors needed to be considered in determining the appropriateness of change of venue. See *Skilling v. United States*, 561 U.S. 358 (2010). In *Skilling*, the Supreme Court explained that cases previously reversed on appeal for failure to change venue had trials that were tainted by an atmosphere "utterly corrupted by press coverage."

561 U.S. at 380. *Skilling* explained that the court must have proof of "vivid, unforgettable information . . . particularly likely to produce prejudice" in determining that a fair trial is untenable. *Id*.

Over the past few decades, we have seen federal courts interpret the Supreme Court's venue case law as requiring a show of community effect, in addition to a show of pretrial publicity. For example, in *United States v. McVeigh*, an Oklahoma district court ruled that the "emotional burden of the explosion and its consequences" and the community prejudice against the defendants accused of the bombing in Oklahoma City was so great that they could not obtain a fair and impartial trial in the state of Oklahoma. 918 F. Supp. 1467 (W.D. Okla. 1996). A decade later, in *United States v. Awadallah*, a New York district court stressed that

"the effects that a massive, disastrous event has wrought on the jury pool as a whole" are more relevant to a change of venue request than pretrial media publicly. 457 F. Supp. 2d 246 (S.D.N.Y. 2006).

After *Skilling*, district courts began analyzing the four factors that the Supreme Court evaluated in determining whether a change of venue is warranted: (i) the size and characteristics of the community; (ii) the nature and extent of the pretrial publicity; (iii) the proximity between publicity and the trial; and (iv) evidence of juror partiality. *Skilling* 130 S.Ct. at 2915-17. The *Skilling* standard and analysis applies to the matter at hand.

### III. ARGUMENT

I.   A trial in Washington D.C. for Mr. Gunby would be by jurors who voted almost unanimously against Donald Trump, who have been barraged with propaganda about a "white nationalist" attack, who are continuously told they were victims of an "insurrection," who were placed under curfew and locked down as a result, and who have been placed under seemingly endless military hold because of danger posed by "Domestic Violent Extremists." The unavoidable community prejudice, and particularized prejudice against Mr. Gunby, render the venire so greatly prejudiced against him that Mr. Gunby cannot obtain a fair and impartial trial in Washington D.C. Review of the Skilling factors weighs Mr. Gunby's case in favor of transfer.

1. *Skilling* Factor 1: The Size and Characteristics of the Community

Washington D.C. is both a small and highly insular political community rendering it unable to produce an impartial jury in Mr. Gunby's case. Washington D.C. is a relatively small community, with a population of about 700,000, and an estimated potential jury pool of less than 500,000.

**About 33% of employed Washington D.C. residents work for the government, considerably reducing the eligible jury pool for a case where government employment will likely cause a bias**.

Moreover, approximately 95% of the voters in D.C. voted against Donald Trump, rendering Washington D.C. as having the least diverse political population as compared to each of the fifty states. Election results: The 2020 presidential race, Politico.com (2021), https://www.politico.com/2020-election/results/ 38 president/ (last visited Mar. 22, 2021).

Further, since the Capitol incident polarization and bias against supporters of Donald Trump has exploded further foreclosing the possibility of empaneling a neutral jury. The D.C. jury pool, already politically averse to Donald Trump supporters, has been barraged with political propaganda from U.S. politicians and coverage of the same by the media following the January 6 incident. According to

a Pew Research Center poll, Democrats were significantly more likely to hear about the Capitol incident than Republicans.

Washington D.C. provides a small, uniform pool of people when compared to Houston in the Skilling case, which had a "large, diverse pool" of 4.5 million eligible jurors. Skilling 561 U.S. at 382. Indeed, Washington D.C. is more similar to the community in Rideau, a small town of 150,000 residents; or even Puerto Rico, which has "a compact, insular community" of approximately 3 million people. Skilling, 130 S.Ct. at 2915; United States v. Casellas-Toro, 807 F.3d 380, 385 (1st Cir. 2015); see also Mu'Min v. Virginia, 500 U.S. 415 (1991) (potential for prejudice mitigated by the size of the Eastern District of Virginia, "which has a population of over 3 million"); but see Gentile v. State Bar of Nev., 501 U.S. 1030 (1991) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).

2. ***Skilling* Factor 2: Nature and Extent of the Pretrial Publicity**

The pretrial notoriety of the Capitol incident is more complicated, publicized and widespread than any other criminal matter in Washington D.C.'s history. Aside from media publicity, there is extensive political publicity for the Capitol cases. It appears that every local D.C. politician, and every national politician working in D.C., has chimed in on this case. More fuel was added to the fire as Democrats, the party that mirrors the beliefs of 95% of the D.C. jury pool, started

referring to the individuals involved in the Capitol incident as "white supremacists" and "insurrectionists" — during a time of exceptional political divide in the United States.

President Biden made a recent speech on racial tensions in the U.S. in which he referred to the Capitol arrestees as "a group of thugs, insurrectionists, political extremists, and white supremacists." The Biden administration warned that these people were "ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false narratives." (Notably, not a single one of the more than 300 arrested Capitol defendants have been charged with terrorism, hate crimes, or insurrection — contrary to what the Biden administration warnings would imply.)

This rhetoric combined with the already small and politically homogenous community Washington D.C. presents raises grave concerns about the ability to empanel a fair jury in the venire. Further, at least 26,000 National Guard troops took over Washington, D.C. in the wake of the Capitol incident.

Washington D.C. residents were impacted emotionally, visually, and physically by the military restrictions. Washington D.C. resident Andrew Kovacs told NPR, "It feels like Gotham City from the Batman movies where we are kind

of on our own, locked in the city here. You know, with the bridges closing out of Virginia, it feels like it's just us, and the whole world is watching." Brandon Stryder explained the practical struggles of living inside of a military enclosure, saying, "There's a checkpoint actually set up right by our building. A few nights ago, we were trying to pull our car out to go get groceries and they put a cinder block, blocking the alleyway so we couldn't even exit the parking garage." 6 D.C. resident Yolanda Inchauregui told NPR, "I feel like I'm in a war."

Moreover, D.C. residents feel that they are being punished for the wrongdoing of the "mob attack on the Capitol," with one D.C. resident expressing that, "a fence punishes the wrong people." This sentiment that someone needs to be punished for impacting the D.C. community is further evidence that this insular community cannot fairly serve as an unbiased venire in this case.

Washington D.C. residents, who were already predisposed to political bias against the Capitol defendants, had their bias cemented by the burden of enduring a militant response to the January 6 incident. Furthermore, the tensions in the city are suggestive of the residents' predisposition to "punish" Capitol incident defendants.

Between the media's concentration on Mr. Gunby, the political response to the Capitol incident, and the relentless media coverage of political statements made about the Capitol defendants, this case is rendered into the type of exceptional

circumstance that warrants a transfer of venue, as the presumption of prejudice is unavoidable.

    4. **Skilling Factor 4: Evidence of Juror Partiality**

    Skilling emphasized "the kind of vivid, unforgettable information the Court has recognized as particularly likely to produce prejudice," when considering the factor of jury partiality. Skilling, 561 U.S. at 383. The Capitol incident was in itself, vivid and unforgettable. Of course, the media's constant replay of the imagery has made sure that no one can forget it. But the imagery for D.C. residents did not stop at the Capitol. The closure of Washington D.C. throughout 2021, the physical appearance of Washington D.C. as a military state for months after the Capitol incident, the restrictions on D.C. residents' movement, the nonstop media discussion about the incident, the nonstop political attacks on the individuals involved with the incident as "insurrectionists," the firing of individuals associated with the incident — combine together to form the type of vivid, unforgettable information that inarguably leads us to presume bias for the entire venire.

    Moreover, the fact that approximately 95% of the voters in D.C. voted against Donald Trump, yet the facts of this case require the jury to be entirely open-minded to a political case that prominently features Donald Trump, during a time of exceptional political divide in this country, weighs heavily on juror partiality. Juror bias against Mr. Gunby cuts deeper, still. President Biden

denounced Trump supporters as "thugs, insurrectionists, political extremists, and white supremacists." Mr. Gunby is being scapegoated for our societal race problems and being used by Democrat commentators as an example of someone who should be socially reprimanded.

Those who control the political narrative are sending a message to all prospective jurors that anything but a guilty verdict will be unacceptable. Nancy Pelosi has made it clear that voting in favor of conviction of "insurrection" is "courage," while voting against conviction is "pathetic."

According to a 2021 research paper by scientists from six U.S. universities, political positions are influencing Americans' decisions to the point of irrationality. "For example, research has found that employees accept lower wages to work for politically like-minded entities," amongst other unsound decisions driven primarily by politics.  Political polarization "ultimately deprives individuals of intellectual diversity, among other things," the researchers concluded.  This research leads to the inevitable conclusion that the insular politics of Washington D.C. are a significant risk to a fair trial by an impartial jury in a case that is entirely political, with a defendant who was marred by the media as a polarizing political figure.

Mr. Gunby is entitled to a fair trial. The growing number of personal attacks on Mr. Gunby by the media and on social media, compounded by the prejudicial community impact on Washington D.C. that arose out of the city's response to the January 6 Capitol incident, have effectuated pretrial prejudice against Mr. Gunby in Washington D.C. that is so likely to have permeated the jury pool with prejudice that the venire must be presumed as tainted. This case is the embodiment of the "huge . . . wave of public passion" that was seen in *Dowd*. 366 U.S. at 728. Mr. Gunby's case meets and exceeds the standard set out in Rule 21(a) and in *Skilling*.

### A. Voir Dire Is Ineffective In Cases of Emotional Pretrial Publicity

Rule 21(c) of the Federal Rules of Criminal Procedure states that "[a] motion to transfer may be made at or before arraignment or at any other time the court or these rules prescribe." The D.C. Circuit has historically preferred voir dire of potential jurors as a means of dealing with pretrial publicity, instead of deciding on transfer under Rule 21(a) as raised "at or before arraignment," under Rule 21(c). See *United States v. Haldeman*, 559 F.2d 31, 60, 63-64 (D.C. Cir. 1976).

Taking this position further, the D.C. Circuit had placed a burden on the defense that was higher than the standards of the Federal Rules of Criminal Procedure. Instead of requiring a showing of a great prejudice under Rule 21(a), the D.C. Circuit imposed a higher standard of "extreme circumstances." See *United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir. 1995); *United States v.*

*Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995). After *Skilling*, D.C. Circuit's "extreme circumstances" test became insufficient and has been replaced with the four-prong analysis as outlined supra. While the Supreme Court in *Skilling* did not bar a court from deferring the decision on a change of venue motion until voir dire, the *Skilling* court did not abrogate Rule 21 either.

While there are cases where time and thorough voir dire may be sufficient to correct for pretrial publicity, emotional publicity and community publicity cannot be cured through either time or *voir dire*. Of particular importance on this are the finding from On the Effectiveness of *Voir Dire* in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study, which found that *voir dire* challenges are insufficient and ineffective at weeding out biased jurors in cases with prejudicial pretrial publicity.[1] "The net effect of careful voir dire concerning pretrial publicity, therefore, was nil, and the bias created by the publicity survived voir dire unscathed."[2]

---

[1] Kerr, N L, et al. "On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An 64 Empirical Study." *Am. University Law Review*, vol. 40, no. 2, 1991, pp. 665–701, https://www.ojp.gov/library/abstracts/effectiveness-voir-dire-criminal-casesprejudicial-pretrial-publicity-empirical.

[2] *Id*. at 697.

Furthermore, "emotional publicity" could not be cured, not even through time and continuances.³ See also *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed"). Emotional publicity was defined as the kind of sensational publicity likely to arouse an emotional response.

Mr. Gunby's case is full with emotional pretrial publicity. The unprecedented community prejudice in Washington D.C., the unprecedented amount of political and media commentary on the criminal case, the staggering amount of emotion that charged the 2020 Presidential election, and the emotional socio-political issues at the heart of the publicity surrounding Mr. Gunby's case, render this case the type of "emotional publicity" case that infects the D.C. venire with a bias that cannot be cured. Nothing about the pretrial publicity and community prejudice in this case are similar in scope or magnitude to the publicity cases that came before the D.C. Circuit in the past. To apply the same principles of protection to this Capitol case as prior D.C. publicity cases would be constitutionally insufficient to preserve the Mr. Gunby's Fifth and Sixth Amendment rights.

---

³ *Id.* at 675.

Therefore, the D.C. Circuit's usual practice of deferring a motion for transfer until after voir dire is insufficient to protect Mr. Gunby, and may instead result in a false sense of security with a jury panel that is inherently incapable of unbiased adjudication. The only remedy to cure the prejudicial pretrial publicity and community prejudice against the defendant is to transfer this matter to an alternative venue.

B. **South Carolina is more diverse than D.C.**

Not only does jury diversity underpin the constitutional guarantee of a fair trial and ensure that juries represent the "the voice of the community," research shows that diverse juries actually do a better job. A 2004 study found that diverse groups "deliberated longer and considered a wider range of information than did homogeneous groups." In fact, simply being part of a diverse group seems to make people better jurors; for example, when white people were members of racially mixed juries, they "raised more case facts, made fewer factual errors, and were more amenable to discussion of race-related issues." Another study found that people on racially mixed juries "are more likely to respect different racial perspectives and to confront their own prejudice and stereotypes when such beliefs are recognized and addressed during deliberations." In addition, the verdicts that diverse juries render are more likely to be viewed as legitimate by the public.

South Carolina is a much larger jurisdiction than Washington D.C. South Carolina is also a convenient forum since Mr. Gunby resides in the District of South Carolina. Witnesses for the Mr. Gunby's defense also reside in the District of South Carolina.

While pretrial publicity was also prevalent in South Carolina, it did not compare to the level of political publicity experienced in Washington D.C., nor was the community prejudiced through the closure of their streets or through continuous National Guard presence. South Carolina residents have not been warned that domestic terrorists are threatening their hometown. South Carolina is not an insulated and nearly totally homogenous political community. South Carolina residents are not employed by the federal government in any statistically significant rates. And, the parties are significantly more likely to find an unbiased jury panel in a community where internet access and media exposure is more limited. The parties are much more likely to find objective jurors in South Carolina than in Washington D.C. Applying the reasoning of the United States Supreme Court, as well as the highest state appellate courts, transfer of this case is the only appropriate relief.

IV. CONCLUSION

Mr. Gunby has demonstrated that he faces significant prejudice, hatred and hostility in the District of Columbia, prohibitive of a fair and impartial jury trial.

He rightfully has invoked his constitutional guarantee to a fair trial by an impartial jury under the Fifth and Sixth Amendments, and aptly requests a transfer of venue to the District of South Carolina, Greenville Division, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure.

Dated: October 7, 2022　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　John M. Pierce
　　　　　　　　　　　　　　　　　　　21550 Oxnard Street
　　　　　　　　　　　　　　　　　　　3rd Floor, PMB #172
　　　　　　　　　　　　　　　　　　　Woodland Hills, CA 91367
　　　　　　　　　　　　　　　　　　　Tel: (213) 400-0725
　　　　　　　　　　　　　　　　　　　Email: jpierce@johnpiercelaw.com
　　　　　　　　　　　　　　　　　　　*Attorney for Defendant*

CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify and attest that on October 7, 2022, I caused this document to be uploaded and filed in this case, using the electronic filing system established by the Court. By doing so, I automatically served the document to counsel for the United States.

/s/ John M. Pierce
John M. Pierce