**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 21-cr-626 (PLF)** |
| v. | : | |
| | : | |
| DEREK COOPER GUNBY, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Derek Cooper Gunby to 12 months' incarceration, one year of supervised release, $500 in restitution, a fine, and mandatory assessment fees of $25 for each Class A misdemeanor, and $10 for each Class B misdemeanor. A sentence of 12 months' incarceration represents the high-end of the Guidelines imprisonment range of 0-12 months' incarceration.

### I.    Introduction

Defendant Gunby, a 40-year-old construction worker and former country club manager, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

After an eight-day trial, on November 13, 2023 a jury returned verdicts of guilty on all five counts charged against defendant Gunby, including one felony count (Count One, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2), and four misdemeanor counts: Count Two, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Three, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Four, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Five, Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). On August 28, 2024, this Court granted the government's motion to dismiss Count One.

The government's recommendation is supported by the defendant's (1) violent narration of his actions on January 6, (2) aggressive and threatening language in the hours and days after he stormed the Capitol Building, (3) Gunby's intent to stop the certification, (4) the length of time spent at the Capitol—over 4 hours—and (5) Gunby's lack of remorse.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Gunby's crime support a sentence of 12 months' incarceration in this case.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.  Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 ("Statement of Facts") at 1-2.

*Defendant Gunby's Role in the January 6, 2021 Attack on the Capitol*

### A.  Gunby's Preparation for January 6

On or about January 5, 2021, Gunby drove to Washington D.C. from his residence in Anderson, South Carolina. Gunby planned to attend the "Stop the Steal" rally on January 6, 2021. Gunby expected violence in D.C.  In fact, the night before the rally, Gunby posted to Facebook two photos of brick piles on the streets of D.C. captioned, "🚨Head's up to Patriots in D.C.🚨 They've already started dumping bricks. For 'construction purposes' yea sure… Be safe, watch your back."  Gunby commented on the images, "Cops in leftist controlled areas of the US seem to assist with this type of thing for leftist terrorism.  We're ready. We know you, we know what you are and what you bring to play with.  We're also smarter and are willing to die for our beliefs whereas you are not."



*Image 1* (Gunby's Facebook post)

## B. Gunby's Actions on January 6

On January 6, 2021, at approximately 6:49 a.m., Gunby posted a photo of himself (in fatigues) and another individual traveling on the Metro, with the caption, "Up at Zero Dark Thirty to stop this steal." Govt. Trial Exhibit 414. Gunby later attended the Stop the Steal rally at the Ellipse, and afterwards, headed towards the Capitol. On his way to the Capitol, at approximately 1:53 p.m., Gunby took a photo of gallows, which included a bright orange noose, that had been erected near Capitol grounds. The gallows had messages written on it, including "Fuck Mitch" and "Fuck Pelosi."



*Image 2* (Gunby's photo of gallows erected near Capitol grounds)

Gunby entered restricted Capitol grounds on the West side of the Capitol at around 2:15 p.m.  A photo taken by Gunby as he approached the Northwest stairs showed rioters atop various structures, including scaling the Capitol's retaining wall. Govt. Trial Exhibit 305. Over the stairs was scaffolding erected to support construction for the Presidential Inauguration.

Gunby recorded videos as he advanced toward the Capitol building. Gunby's own video, recorded as he approached the Northwest stairs, shows the protective tarp covering the scaffolding in tatters from rioters who had ripped, slashed, and cut the tarp while advancing closer to the Capitol Building. Govt. Trial Exhibit 306.



*Image 3* (Screenshot from video Gunby recorded as he approached the Northwest stairs, which showed rioters climbing scaffolding and the tattered tarp (Govt. Trial Exhibit 306 at Timestamp 00:39))

As Gunby approached the Northwest stairs he narrated, "I think that the building's been breached, but I'm not sure. We're trying to head up and get in there.  The scaffolding up there is just crawling with people and these steps, they've already made it up all the way up the stairs.  And tear gas has been deployed over here." *Id.*

As Gunby made his way up the Northwest stairs, he continued to narrate the scene, "We're on the Capitol steps… people are climbing the scaffolding and *we are trying to storm the Capitol*

*Building. We're taking the country back.  You don't get to do this to my country and not suffer the consequences.*" Govt. Trial Exhibit 307 (emphasis added).

Gunby then made his way into the Northwest Courtyard where he joined the crowd of rioters pushing their way into the Capitol Building through the Senate Parliamentarian Door. Gunby again recorded himself. Gunby's video showed the damage done to windows near the Parliamentarian Door, which were bashed and broken. Govt. Trial Exhibit 309. A shrill alarm can be heard blaring loudly from inside the building. *Id.* As he moved closer and closer towards the building's entrance, Gunby explained, "We've got some breaches in the Capitol Building… in which I'm about to go, because enough is enough. We've sat back, we've been nice. We sat there and watched Black Lives Matter and Antifa burn our cities down this year. *And we're depending on Mike Pence to do the right thing in certifying this vote?  No.*" *Id.* (emphasis added). Gunby's video also captures Gunby yelling with the crowd, "Push forward!" as they pushed inside the building. *Id.*

At around 2:58 p.m., Gunby entered the Capitol Building through the Senate Parliamentarian Door.



*Image 4* (Gunby entering Capitol Building)  Govt. Trial Exhibit 208a at Timestamp 00:04

*Image 5* (Gunby entering Capitol Building)  Govt. Trial Exhibit 207a at Timestamp 00:05

Gunby recorded video as he moved past an office and attempted to go deeper into the building. Govt. Trial Exhibit 310. However, shortly after, officers further down the hallway joined forces to start forcing the mob of rioters back out of the building, including shooting pepper balls at rioters. Govt. Trial Exhibit 208a.



*Image 6* (Officer using line formations and pepper balls to force Gunby and other rioters out of the Senate Parliamentarian Door (Govt. Trial Exhibit 208a at Timestamp 02:16))

At approximately 3:01 p.m., officers pushed Gunby and the rest of the rioters back out the Senate Parliamentarian Door. *Id.* Immediately after his expulsion from the building, at approximately 3:01 p.m., Gunby recorded another video while standing next to the steps leading to the Parliamentarian Door. Gunby explained that he "just got a dose of tear gas" and that officers "were firing rubber bullets." Govt. Trial Exhibit 314.

However, this violent encounter with officers did not deter Gunby. Instead, Gunby remained on Capitol grounds. He moved from the Northwest Courtyard to the Upper West Terrace. Police officers in riot gear were amassing on the Upper West Terrace as Gunby arrived. Govt. Trial

Exhibit 315.  Gunby stayed on the Upper West Terrace close to the balcony. As shown in Gunby's videos, from his vantage point, Gunby could see the chaos and violence on the Lower West Terrace just below him.  At approximately 3:15 p.m., Gunby posted a photo to Facebook showing the crowd of rioters amassed on the Lower West Terrace and in the West Plaza. Govt. Trial Exhibit 415. Minutes later, Gunby recorded the crowd shoving two police officers who were pulled out of the Tunnel. Govt. Trial Exhibit 317. Gunby described the scene: "They've taken a shield from… a Metro policeman… he's kinda, looks terrified…" Rioters began chanting "Police stand down," and Gunby joined the chant.

Still not deterred by the violence he witnessed, Gunby made his way to the Lower West Terrace and found a front row seat to the violence taking place inside the Tunnel.  At approximately 4:28 p.m., Gunby recorded officers desperately trying to get rioters to disperse, noting that officers were "shooting something… shooting mace" at rioters. Govt. Trial Exhibit 318. At approximately 4:32 p.m., Gunby took a photo of an officer pointing a riot-control weapon directly at the crowd. Govt. Trial Exhibit 319.

### C.  Gunby's Statements and Actions after January 6

Shortly after the riot, Gunby recorded a Facebook Live video while on the Metro back to his hotel. During that Facebook video, Gunby spoke for almost ten minutes about the riot and why he believed it occurred. Gunby explained,

> *We all pretty much surrounded the Capitol. We are at a point now in this country where they are going to listen to us, they have to listen to us.*  Your Congressional leaders are not afraid of you.  They are more afraid of the Chinese Communist party.  They are more afraid of left-wing media.  And they are more afraid of Antifa and Black Lives Matter than they are of the American patriot, the American conservative, the American libertarian, the person that's on the right side of the Constitution.  And let me tell you about the Constitution.  A lot of people have a fundamental misunderstanding of what fidelity to the Constitution actually looks like, what the Constitution actually says, what your role is as someone who takes an oath to the Constitution, whether you're a police

office, a Congressperson, senator, president, any type of public servant that takes an oath to the Constitution.  You need to understand the gravity of that oath and what it means.

Govt. Trial Exhibit 409 (emphasis added). Later in the same video, Gunby admitted,

> Came a little closer to some nightsticks and rubber bullets than we wanted to. But, this was ultimately peaceful. I do believe that the Metro police here in Washington do understand the stark difference between Trump supporters, the patriots, what have you, than say ANTIFA, Black Lives Matter. The character is completely different. There couldn't be more of a stark difference in justification, and intent, and capability. If *the American patriot wanted to storm this Capitol, take over this building, and take care of all of Congress in there, they could do it…* They could do it…
> *They just tried to steal this election right in front of everybody's face. And any of you, any of you, who are gonna sit there and look anybody in the face, and say that that didn't happen,* that this election fraud didn't happen, that we're making it up, that it's unsubstantiated, *you need to wake up.*

*Id. (emphasis added).*

In the weeks and months after the riot, Gunby also posted multiple Telegram messages confirming that he believed that the 2020 election had been stolen, and that those who took an oath to defend the Constitution were obligated to refuse to accept the Biden presidency.  For instance, Gunby sent the following message on Telegram:



Just a friendly reminder that CGIBiden did not even come close to winning this election. If you know this, and you took an oath to the Constitution, you are OBLIGATED to refuse to accept or acknowledge that he is POTUS.

Govt. Trial Exhibit 322b. Gunby's Facebook messages after the riot also confirmed his belief that the 2020 presidential election had been stolen, and that he believed he did nothing wrong at the Capitol on January 6.

In these communications, Gunby reinforced that his actions at the Capitol were to block the peaceful transfer of presidential power after the 2020 election. Gunby's statements provide further evidence that he sought to delay or stop the certification because he believed the 2020 election was fraudulent and the incoming presidency was unconstitutional.

However, Gunby's resistance to the rule of law and legitimate legal proceedings did not stop with his actions on January 6, 2021. Once Gunby was arrested and charged for his actions at the Capitol, he continued to post videos on Facebook detailing his grievances with how he believed he was treated by the federal legal system. For instance, on October 27, 2021, Gunby posted a video where he said, "I do not view this current congress, non-presidency, court, as legitimate. . . . They didn't win, it's not legitimate". Gov. Sentencing Ex. A. On January 26, 2022, Gunby posted another video to his Facebook account, in which he gave a "statement" related to his ongoing criminal prosecution. There, he stated that "I'm not sorry I went to DC and I'm not sorry I went into the building." Gov. Sentencing Ex. B He continued that he was "oath bound to not give legitimacy to this farce," in reference to the prosecution against him. *Id.* While every American is entitled to their First Amendment right to free speech, these statements, particularly Gunby's lack of recognition of this Court as "legitimate," inform the Court as to Gunby's state of mind and his lack of acceptance of responsibility for his actions on January 6, 2021.

*The Charges and Trial*

On August 30, 2023, the United States charged Gunby by a five-count superseding indictment alleging violations of 18 U.S.C. §1512(c)(2), 18 U.S.C. §§ 1752(a)(1) and (2), and 40

U.S.C. §§ 5104(e)(2)(D) and (G). On November 11, 2023, after an eight-day jury trial, Gunby was found guilty of all counts. On January 18, 2024, this Court granted the defendant's motion to stay sentencing pending the decision in *United States v. Fischer*, 144 S. Ct. 2176 (2024). On August 13, 2024, the government moved to dismiss Gunby's conviction under 18 U.S.C. §1512(c)(2) in light of the United States Supreme Court's decision in *Fischer*, which this Court granted on August 28, 2024. Mr. Gunby is currently scheduled to be sentenced on the remaining counts of conviction on December 17, 2024.

### III.    Statutory Penalties

Gunby now faces a sentencing for violating Counts Two through Five of the Superseding Indictment: Count Two, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Three, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Four, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Five, Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). As they are Class B Misdemeanors, the Sentencing Guidelines do not apply to counts Four and Five of the indictment. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

## A. Guidelines Calculations for Each Count

The revised PSR includes two errors. First, the revised PSR does not include a Guidelines analysis for both Counts—Counts Two and Three—to which the Guidelines apply. *See* PSR ¶¶ 38-50.[2] Second, the PSR applies the two-level reduction in U.S.S.G. § 4C1.1, which the government believes should be inapplicable here, as discussed further below. The government's Guidelines analysis is as follows:

### *Count Two: 18 U.S.C. § 1752(a)(1)— Entering and Remaining in a Restricted Building or Grounds*

The Statutory Index in Appendix A to the Sentencing Guidelines identifies *two* Chapter Two Guidelines for violations of 18 U.S.C. § 1752: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). Since Section 1752(a)(1) is essentially a trespass statute, § 2B2.3 (Trespass) is "the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Appendix A, Introduction; *see also* U.S.S.G. § 1B1.2(a); U.S.S.G. § 2X5.1.

| | | |
|---|---|---|
| Base Offense Level | 4 | U.S.S.G. § 2B2.3(a) (Trespass) |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |

---

[2] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶ 38) that Counts Two and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

| (Restricted Building or Grounds) | | On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service, namely the Vice President, were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| --- | --- | --- |
| **Total** | **6** | |

**Count Three: 18 U.S.C. § 1752(a)(2)— Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

The Statutory Index in Appendix A to the Sentencing Guidelines identifies *two* Chapter Two Guidelines for violations of 18 U.S.C. § 1752: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). Since Section 1752(a)(2) involves more than mere trespass, namely disorderly and disruptive conduct, § 2A2.4 (Obstructing or Impeding Officers) is "the guideline most appropriate for the offense conduct charged." Appendix A, Introduction; *see also* U.S.S.G. § 1B1.2(a); U.S.S.G. § 2X5.1.

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) (Obstructing or Impeding Officers) |
| --- | --- | --- |
| **Total** | **10** | |

**Counts Four and Five: 40 U.S.C. § 5104(e)(2)(D)— Disorderly Conduct in a Capitol Building and 40 U.S.C. § 5104(e)(2)(G)— Parading, Demonstrating, or Picketing in a Capitol Building**

Violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G) are Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* 18 U.S.C. § 3559 ("An offense… is classified[,] if the maximum term of imprisonment authorized is…six months or less but more than thirty days, as a Class B misdemeanor"); 40 U.S.C. § 5109(b) ("A person violating section… 5104(b), (c), (d), (e)(2), or (f) of this title… shall be… imprisoned for not more than six months"); U.S.S.G. § 1B1.9 ("The sentencing guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction").

**B. Grouping Analysis**

Under U.S.S.G. § 3D1.2(a) and (b), "closely related counts" group. Counts Two and Three comprise a single group under U.S.S.G. §3D1.2(a) and (b) because the victim of each count is

Congress. Under U.S.S.G. § 3D1.3(a), the offense level for a group of closely related counts is the highest offense level of the counts in the group. The highest offense level is 10 (for Count Three); therefore, **the combined offense level for this group is 10**.

## C. Inapplicability of U.S.S.G. § 4C1.1

Section 4C1.1 does not apply in this case, because Gunby used and encouraged credible threats of violence against law enforcement while at the Capitol, in contravention of U.S.S.G. § 4C1.1(a)(3). In *United States v. Bauer*, No. 21-cr-386-2 (TNM), Judge McFadden defined a credible threat of force as "a believable expression of an intention to use physical force to inflict harm." 714 F. Supp. 3d 1, 6 (D.D.C. 2024). Judge Howell has said that, when examining whether the defendant's conduct posed a credible threat of violence, one must consider the totality of the circumstances surrounding that conduct:

> In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.

*United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

Here, Gunby witnessed violence, encouraged violence, and joined in with a mob he knew to be exacting violence on police trying to guard the Capitol building. From Gunby's first moments on Capitol grounds, he narrated what he witnessed, including tear gas deployed and a large mob "storming" the Capitol. The government made the point at trial, but it bears mentioning here, that the words Gunby used in his videos are telling. "Storming the Capitol building," "Take our country back," "breaches" in the building. He also stated that those responsible for what he believed to be

a stolen election, "don't get to do this to my country and not *suffer the consequences*." (emphasis added). These are terms of violence, not peace. Further, after Gunby exited the Capitol building—where he experienced violence first hand—he stayed on Capitol grounds and watched as the mob at the Lower West Terrace tried to breach the Tunnel and fought with the police guarding that entrance. Indeed, he joined in a chant with the crowd that encouraged the police to "stand down." The implication of that chant was clear—stand down, or else. And Gunby continued to lend his support to that crowd for over an hour, moving down from the Upper West Terrace to the Lower West Terrace itself, where he filmed rioters trying to breach the Tunnel entrance. Just as Judge McFadden denied the application of 4C1.1 in the *Bauer* case—where the defendant was convicted of only 1512(c)(2) and misdemeanor charges as Gunby was originally here—so too should the Court deny its application here. The government understands that the application of 4C1.1 is case-specific and fact-intensive. The government will be ready to address the Court's questions regarding its application at sentencing and, should the Court apply 4C1.1, justify the potential upward variance to the government's recommended sentence.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same

sentence regardless of whether § 4C1.1 applies.[3]

## D. Guidelines Imprisonment Range

The government calculated Gunby's criminal history as a category I. Accordingly, the government calculated Gunby's total adjusted offense level, at 10, and his corresponding Guidelines imprisonment range at 6-12 months' incarceration.[4]

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## E. Other Guidelines considerations

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government must contextualize the crime. Moreover, the following information and argument make it clear that – while the government is not advocating

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

[4] If U.S.S.G. § 4C1.1 is applied, and no two-level variance is given to compensate for its application, then the offense level would be 8, and the corresponding Guidelines imprisonment range would be 0-6 months' incarceration.

for such variance or departure – the high end of the guidelines is not only reasonable, but fully balances the defendant's conduct and the circumstances in which he committed said conduct. One cannot divorce the gravity of the overall threat to democracy from the defendant's assaultive behavior.

Indeed, as it stands now, nothing in this defendant's guidelines calculation reflects the fact that the defendant was responsible for substantial interference with Congress's work to peacefully transfer power from one administration to the next.[5] There are no specific offense characteristics here for attacking democracy or abandoning the rule of law. Thus, a sentence at the high end of the defendant's range properly ""reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to

---

[5] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context. For example, in *United States v. Sparks*, 21-cr-87-TJK, Judge Kelly sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21, and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr., at 94-95. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

To be clear, the fact that the government is not seeking a variance or departure does not diminish the gravity of our request and the need to appropriately account for the conduct and the crime.[6]

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 12 months' incarceration.

### A.    The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gunby's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gunby's, the absence of violent or destructive acts is not a mitigating factor. Had Gunby engaged in such conduct, he would have faced additional criminal charges.

Gunby went to the Capitol on January 6, 2021, *expressly* to try to stop the certification of the 2020 presidential election from going forward. He posted the morning of January 6 that he was up early to "Stop *this* Steal." Notice that Gunby did not simply repeat the slogan of the rally he was going to attend, he made an effort to expressly state that he was trying to stop *this* steal—not

---

[6] As noted above, to the extent the Court believes U.S.S.G. 4C1.1 applies, the government is seeking a variance to counterbalance that two-level reduction.

"the" steal or "a" steal—*this* steal. When he got to the Capitol, Gunby recorded multiple videos of what he experienced as he got closer and closer to the building. His own words recount that he saw tear gas, smoke, flash bangs, and heard clashes of rioters with police. In his recounting, he witnessed people "storming" the Capitol, and he joined in to help "take this country back." When he was moments from entering the building itself, he stated that he did not trust then-Vice President Mike Pence to stop the vote from being certified and Gunby decided he was going to take matters into his own hands. Even after being forced from the Capitol building by police shooting pepper balls, Gunby remained on Capitol grounds and watched and recorded the violence that occurred in and around the Lower West Tunnel.

After his actions, Gunby showed no remorse. To the contrary, he pseudo-documented his legal journey on his Facebook page, posting videos after many of his court appearances, bemoaning the "corrupt" court system and DOJ. He repeatedly said that he did not recognize the legitimacy of this Court, the Department of Justice, or the Biden administration. Even after he was convicted, Gunby continued to rail against his conviction, claiming that the jury pool was tainted and that it was impossible to get a fair trial in D.C.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 12 months' incarceration in this matter.

### B. Gunby's History and Characteristics

While Gunby has no criminal history, his actions and statements since January 6, 2021, as described above, reveal the picture of someone with no regard for the justice system, the rule of law, or the institutions of democracy. On multiple occasions, Gunby advocated and expressed support for the use of violence to attain his goals of keeping then-president Trump in power. Gunby has expressed *no* remorse for his actions, saying, "I'm not sorry I went to DC and I'm not

sorry I went into the building." Additionally, the draft PSR indicates that the defendant suffers from no physical, mental, or substance abuse issues that would prevent him from serving a period of incarceration. PSR ¶ 64-69.[7] Gunby's characteristics and lack of remorse weigh in favor of the government's recommendation of incarceration in this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

---

[7] The PSR notes that Gunby has a ten-year old son; however, the son lives in Germany with his mother. PSR ¶ 62.

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Gunby's lack of remorse for his actions and lack of respect for the legal proceedings against him weigh heavily in favor of a sentence of incarceration. Following his actions on January 6, 2021, and throughout the pendency of his case, Gunby has simultaneously acknowledged his actions, yet denied any wrongdoing—in other words, Gunby stormed the Capitol building, broke into the building itself with hundreds of other rioters, wanted to stop Congress from certifying the 2020 Presidential Election results, yet sees nothing wrong with what he did. Indeed, in a video recorded shortly after he left Capitol grounds Gunby stated that he and his fellow rioters would return if needed, next time with "better toys," a thinly veiled reference to firearms. Gunby's complete lack of remorse and willingness to engage in further violence, a term of imprisonment to deter Gunby's future criminal acts is warranted.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[8] This Court must sentence Gunby based on his own

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Gunby was convicted of four misdemeanor offenses, including two Class A and two Class B offenses. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Bradley Weeks*, 21-cr-247 (JDB), the defendant posted comments online regarding his plans to travel to Washington, D.C., and plans for violence if then-President Trump was not kept in power. On Jan. 6, 2021, Weeks attended the "Stop the Steal" rally at the Ellipse, then marched to the Capitol building. As he moved towards the Capitol grounds, Weeks filmed a video of the crowd and stated, "We are marching to the Capitol building, Ladies and Gentleman, to show these Congressmen who runs America." In an almost exact parallel to Gunby's actions at the Capitol, upon reaching the Upper West Terrace of the Capitol, Weeks set the camera to record himself, declaring, "We've reached the steps.  We've had to climb scaffolding.  We've had to climb ladders.  We've had to break things to get through, but we've gotten through.  We've gotten through, and we are taking back the Capitol! We're taking back our country!  This is our 1776!

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

This is where it's gonna happen! This is where Tyranny will fall! This is where America will rise! Look at this, America! Look at this!" For his actions, Weeks was sentenced to 10 months' incarceration and 24 months supervised release to include 12 months of home detention.

In *United States v. James Rahm, Jr.,* 21-cr-150 (TFH), on January 6, 2021, the defendant posted a photo he took of the Capitol on Facebook with the caption, "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol back." Rahm then entered the Capitol through the East Rotunda Doors after rioters on the inside shoved police out of the way and opened the doors for Rahm and other rioters on the portico. Once inside, Rahm recorded himself stating, "Time to find some brass and kick some friggin' ass." Rahm also celebrated halting the certification of the 2020 Electoral College vote count. After a stipulated trial where the Court found Rahm guilty of the same charges Gunby was initially found guilty of by the jury, Rahm was sentenced to 12 months' imprisonment and 36 months' supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Gunby was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Gunby to pay $500 in restitution for his convictions on Counts Two through Five. This amount fairly reflects Gunby's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    FINE

The defendant's convictions for violations of 18 U.S.C. 1752(a)(1) and (2), 40 U.S.C. 5104 (e)(2)(D) and (G) subject him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense

to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

## VIII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 12 months' incarceration and one year of supervised release. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Gunby's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    */s/ Kyle M. McWaters*
Kyle M. McWaters
Assistant United States Attorney
D.C. Bar No. 241625
601 D Street NW
Washington, DC 20530
(202) 252-6983
kyle.mcwaters@usdoj.gov